UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| v. | ) ) | Criminal No. 18-10467-LTS |
| ANGEL JAVIER MORELL-ONEILL, | ) ) ) | |
| Defendant. | ) ) | |

ORDER ON DEFENDANT'S MOTION TO SUPPRESS (DOC. NO. 76)

September 16, 2020

SOROKIN, J.

Defendant Angel Javier Morell-Oneill was indicted by a grand jury on July 31, 2019 for possession of more than 400 grams of fentanyl with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(vi), possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i), unlawful reentry of a deported alien, in violation of 8 U.S.C. § 1326, and being an illegal alien in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(5)(A). Doc. No. 27.[1] Morell-Oneill has moved to suppress various statements he made following his arrest, Doc. No. 76 at 12, various statements made by Sussy Soto-Medina, id., drugs and a firearm recovered pursuant to a search warrant from Apartment 201 in which Soto-Medina lived, id. at 27, and evidence gathered from seven cellphones, pursuant to another search warrant, id. at 32. The Government has opposed. Doc. No. 83. For the reasons which follow, Morell-Oneill's motion is DENIED IN PART. Specifically, the Court DENIES suppression of any statements given by Soto-Medina, the evidence found in Apartment

---

[1] Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing system; pincites are to the page numbers in the ECF header.

1

201, and the evidence found on the seven cellphones. The Court reserves judgment on whether to suppress Morell-Oneill's own statements because disputed issues of fact bear on both whether Morell-Oneill received Miranda warnings and whether his statements were voluntary. An evidentiary hearing will be held on October 7th, 2020 at 10:30 a.m.

I. THE ARREST

Morell-Oneill was arrested on October 22, 2018 as the result of a months' long investigation into his involvement in drug trafficking. Doc. No. 76 at 2. The Government alleges that prior to the day of Morell-Oneill's arrest he sold fentanyl to a Confidential Source ("CS") on two separate occasions. Doc. No. 84-3 ¶ 10. Both transactions were video- and audio-recorded. Id. ¶¶ 12, 16. The Government further alleges that for each of these two prior transactions, Morell-Oneill left his apparent residence in Building 140, located at 142 Pleasant Valley Street, Methuen, Massachusetts, and proceeded to the pre-arranged meeting point where he sold drugs to the CS. Doc. No. 84-3 ¶ 13, 17.

Morell-Oneill arranged a third drug transaction with the CS for October 22, 2018, the day of his arrest, in a communication monitored by government agents. Id. ¶ 20. On that day, he was observed once again leaving from Building 140, this time carrying a white shopping bag, before getting into a vehicle and driving towards the meeting point. Id. During the drive, Morell-Oneill was stopped by Massachusetts State Police, who placed him under arrest. There is a factual dispute over whether Morell-Oneill was informed of his Miranda rights. Compare Doc. No. 80 ¶ 5 (Morell-Oneill's affidavit stating he was not read his rights) with Doc. No. 84-1 ¶ 5 (agent's affidavit stating that Morell-Oneill was read his rights). A subsequent search of the vehicle Morell-Oneill was driving at the scene of the arrest uncovered two kilograms of a substance, which tested positive for fentanyl, in the white shopping bag he was seen carrying earlier. Doc.

No. 84-3 ¶ 21. The search also uncovered seven cellphones. Doc. No. 76 at 32. Morell-Oneill does not challenge the legality of the stop or of his arrest, nor does he seek to suppress the evidence seized from the vehicle. See generally Doc. No. 76.

## II.     THE INITIAL APARTMENT SEARCH & MORELL-ONEILL'S STATEMENTS

Following the arrest, government agents seized Morell-Oneill's keys and proceeded to 142 Pleasant Valley Street. The keys included both a key to Building 140 and a key to Apartment 201 within that building, which is leased in the name of Morell-Oneill's girlfriend or wife, Soto-Medina. Doc. No. 84 ¶ 15. The agents went to the building's leasing office, where they confirmed that Soto-Medina resided in Apartment 201. Id. ¶ 25. The government asserts that the agents recovered two keys from the leasing office, one for Building 140's outer door and one for Apartment 201. Doc. No. 83 at 4. The agents then entered Building 140 using a key, knocked on the door of Apartment 201, and used Morell-Oneill's key to enter the apartment. Id.

Once inside, the agents conducted a sweep of the apartment and remained there until a search warrant was secured some amount of time later. Id. The agents are alleged to have taken photos of the exterior of a closet in which a cache of drugs and a firearm were later found, and to have sent these photos by cellphone to an officer at the scene of Morell-Oneill's arrest, who showed the photos to Morell-Oneill. Doc. No. 76 at 3. Agents allegedly told Morell-Oneill that they were going to conduct a full search of the apartment and threatened to arrest Soto-Medina for whatever contraband they later found in the apartment unless Morell-Oneill confessed. Id.; see also Doc. No. 80 ¶ 7.

Following this, Morell-Oneill made various statements to the agents, to the effect that:

- The drugs discovered in his possession at the time of his arrest were, in fact, his;

- Soto-Medina was indeed the person the agents discovered in Apartment 201, and that she had nothing to do with the drugs located therein;

- Drugs were present in the apartment and could be located in a black duffle bag on the floor of the closet, and;

- A handgun, which he had purchased, could also be found at the same location. Doc. No. 76 at 3–4.

Morell-Oneill raises two arguments for suppressing these statements, one rooted in the Fifth Amendment and one rooted in the Fourth Amendment.

a. Fifth Amendment Analysis

Morell-Oneill argues his statements should be suppressed because he was not read his Miranda rights prior to being questioned and because the circumstances surrounding his questioning were sufficiently coercive to render his statements involuntary. Id. at 27–32.

The Fifth Amendment prohibits the use of compelled testimony by the prosecution in its case in chief. See Oregon v. Elstad, 470 U.S. 298, 306 (1985). The use of physical threats or violence is one way in which government agents may secure involuntary statements, but it is not the only way. See Reck v. Pate, 367 U.S. 433, 440 (1961) ("[T]he blood of the accused is not the only hallmark of an unconstitutional inquisition.") (alteration in original) (quoting Blackburn v. Alabama, 361 U.S. 199, 206 (1960)). "The question in each case is whether a defendant's will was overborne at the time he confessed." Id. at 440 (citation omitted).

The Miranda doctrine stems from this rule but itself provides an independent basis for suppression. The doctrine generally requires this Court to suppress any "statements obtained

4

through custodial interrogation unless the police officer informed the suspect of his right to remain silent and to consult an attorney." United States v. Byram, 145 F.3d 405, 409 (1st Cir. 1998) (citing Miranda v. Arizona, 384 U.S. 436, 478–79 (1966)). For statements to be suppressed under Miranda, the suspect must have been "in custody" at the time the statement was made[2] and officers must have failed to inform the suspect of their "Miranda rights." Id. at 406.

The Court finds that there is a factual dispute regarding whether Morell-Oneill was read his Miranda rights and whether his statements were voluntarily. The government has provided an affidavit stating that he was read his rights, while Morell-Oneill has averred he was not. Compare Doc. No. 80 ¶ 5 (Morell-Oneill's affidavit stating he was not read his rights) with Doc. No. 84-1 ¶ 5 (agent's affidavit stating that he was). Morell-Oneill has also sworn that he was induced to make his confession by the officer's threats to arrest Soto-Medina and has argued that these threats overpowered his will. Doc. No. 76 at 30–31; Doc. No. 80 ¶ 8. Given this factual dispute, the Court will reserve judgment on the admissibility of Morell-Oneill's statements pending an evidentiary hearing.

b. Fourth Amendment Analysis

Morell-Oneill also argues that his statements should be suppressed, along with any statements given by Soto-Medina, because they are the fruit of an unconstitutional search of Soto-Medina's apartment. He claims that the agents' initial entry into Apartment 201 using his key was unconstitutional because it was conducted without a warrant and did not fall within any recognized exception to the Fourth Amendment's warrant requirement. See Doc. No. 76 at 8–11.

---

[2] The Government appears to agree that Morell-Oneill was in custody when the statements were made. See Doc. No. 83 at 16.

Because his statements, and those of Soto-Medina, apparently flowed from this search, he claims they should be suppressed under the "fruit of the poisonous tree" doctrine. Id. at 8–11, 31–32.

The Fourth Amendment protects the right of the people to "be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. Entry and search of the home by the government, without a warrant, is per se unreasonable unless the search is justified by exigent circumstances. See Coolidge v. New Hampshire, 403 U.S. 443, 454 (1971). "There are generally four types of exigent circumstances: (1) hot pursuit of a fleeing felon into a residence; (2) imminent destruction of evidence within a residence; (3) a threatened and potentially successful escape by a suspect from inside the residence, or; (4) an imminent threat to the life or safety of the members of the public, the police officers, or a person located within the residence." United States v. Pena, 924 F. Supp. 1239, 1249 (1st Cir. 1996) (citation and internal quotation marks omitted). Courts must exclude any evidence obtained as a direct result of an illegal search, as well as any evidence that is "derivative of" a Fourth Amendment violation—"the so-called 'fruit of the poisonous tree doctrine.'" Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016) (citation omitted).

Even assuming that Morell-Oneill has standing to move to suppress Soto-Medina's statements or to challenge the search of an apartment registered in her name, a somewhat questionable proposition where Morell-Oneill has not alleged he resided in the apartment or was staying there, the Court concludes that the initial search of the apartment was constitutional because "the need to prevent the imminent destruction of evidence has long been recognized as a sufficient justification for a warrantless search." Kentucky v. King, 563 U.S. 452, 460 (2011) (internal quotation marks omitted) (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)). Police officers do not need a warrant to search a residence when, given the totality of the

6

circumstances, it is objectively reasonable for them to conclude that evidence is at risk of being destroyed. See id. The risk that evidence may be destroyed is particularly heightened in drug cases, where evidence is "easily destroyed by flushing [it] down a toilet or rinsing [it] down a drain." Id. at 461.

Here, there were sufficient grounds for the agents to conclude that contraband was present in the apartment. The previous two times the government had observed Morell-Oneill making drug transactions, he had left the apartment and driven to the transaction. Doc. No. 83 at 7. Morell-Oneill had followed the same pattern that day and was seen leaving his apartment on his way to the deal, carrying a white shopping bag which was found to contain two kilograms of drugs upon his arrest. Id. From this, it was fair to conclude that Morell-Oneill was using the apartment to store drugs. What's more, the government was then aware that Morell-Oneill had recently purchased and obtained a large shipment of drugs totaling approximately 25 kilograms, Doc. No. 84-3 ¶ 19, far more than he was bringing to the meeting—leading to the natural conclusion that significant quantities of drugs remained in the apartment.

Equally important, the agents could reasonably believe that Soto-Medina (or another unknown co-conspirator) would destroy this evidence if she became aware that Morell-Oneill had been arrested. Soto-Medina lived with Morell-Oneill and apparently tolerated his drug dealing. More than that, there were grounds for the agents to suspect that Soto-Medina was involved Morell-Oneill's illegal business. On the day of the deal, she seems to have scouted the location where Morell-Oneill was planning to meet with the CS. See Doc. No. 74-5 at 5 (Soto-Medina arrived at planned meeting location; CS then received call from Morell-Oneill stating location was "hot" and delaying the meeting). And after returning from the meeting site, she apparently scouted the area around Building 140 to cover Morell-Oneill's departure with the

drugs. See id. (Morell-Oneill told CS he was "sending his wife out on foot" to make sure area around Building 140 was clear). From this, the agents could reasonably believe that Soto-Medina was involved in the drug trafficking operation Morell-Oneill is accused of running and would act to protect herself and Morell-Oneill by destroying evidence, should the need arise.

Morell-Oneill argues that the agent's actions were unreasonable because they did not know Soto-Medina was in the apartment and had no reason to believe she would learn of Morell-Oneill's arrest, given that he was arrested "a half-mile away from the target premises," out of view of the apartment, and without the ability to contact Soto-Medina or anyone else. Doc. No. 76 at 11. But the agents knew that Soto-Medina was likely in the apartment because it was listed on her vehicle's registration as her place of residence, Doc. No. 84-3 ¶ 13, the building's leasing company confirmed to the agents that she was the apartment's resident, id. ¶ 25, and intercepted conversations placed Soto-Medina in the vicinity of the apartment shortly before Morell-Oneill left for the sale resulting in his arrest, Doc. No. 74-5 at 5. Thus, the agents could also reasonably conclude that she might learn of or suspect Morell-Oneill's capture before they could secure a search warrant, given his prolonged absence.

For these reasons, the agents had an objective basis to conclude that evidence was in the apartment and that it was threatened with imminent destruction unless they acted. The initial search did not violate the Fourth Amendment and so this Court will not suppress the statements of Soto-Medina and Morell-Oneill as the "fruit of the poisonous tree."

III.   THE SEARCH WARRANT

While the initial search of the apartment was ongoing, the agents secured a warrant to search the premises and the vehicle Morell-Oneill had been driving. Pursuant to that warrant, the agents discovered a large quantity of fentanyl and a handgun in the apartment. Doc. No. 76 at 5.

Notably this affidavit does not include any information arising from the warrantless sweep or search of the apartment. Morell-Oneill has moved to suppress this evidence, arguing that the affidavit underlying the search warrant contains material misrepresentations and that the affidavit, when purged of these misrepresentations, fails to establish probable cause of a nexus between Apartment 201 and Morell-Oneill's alleged criminal activity. See Doc. No. 76 at 12–27.

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed—the 'commission' element, and (2) enumerated evidence of the offense will be found at the place searched—the so-called 'nexus' element." United States v. Dixon, 787 F.3d 55, 59 (1st Cir. 2015) (quoting United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999)). When considering the nexus element, a magistrate must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him," there exists a "fair probability" that evidence will be found in the place to be searched. Feliz, 182 F.3d at 86 (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). A defendant may "request an evidentiary hearing to challenge the truthfulness of statements made by law enforcement agents in a search warrant affidavit." United States v. Hicks, 575 F.3d 130, 138 (1st Cir. 2009) (citing Franks v. Delaware, 438 U.S. 154, 155 (1978)). These hearings are called "Franks" hearings and to obtain one "a defendant must make a substantial preliminary showing that: [1] the warrant affidavit contains a false statement made knowingly and intentionally, or with reckless disregard for the truth, and [2] that the allegedly false statement was necessary to the finding of probable cause." Id. (quoting Franks, 438 U.S. at 155–56) (internal citations and quotation marks omitted).

Morell-Oneill makes much of an alleged contradiction between the warrant affidavit and an internal report prepared by the agents. He claims that the warrant affidavit indicates the agents

used keys procured from the leasing office to access the apartment, while their report shows they actually used keys procured from Morell-Oneill to gain entry. See Doc. No. 76 at 19–25.

The affidavit reads:

> Agents spoke with an employee of the management company at the Summit Place Apartments. That employee confirmed that Sussy-Soto Medina, [Morell-Oneill's] paramour, resides in Apartment 201. The employee of the management company provided agents with a key to the building and to Apartment 201. Agents used the key to enter building 140.

Doc. No. 84-3 ¶ 22.

The report, meanwhile, reads:

> The leasing agent was able to pull up SOTO-MEDINA's resident profile and verify that she lives in apartment 140201, which was located in building 140 on the second floor.
> Investigators went to the residence knocked on the door and announced their presence and used MORELL-ONEILL's keys to unlock the door.

Doc. No. 84 ¶¶ 15–16.

To Morell-Oneill, this alleged contradiction over which key the agents used is compounded by the agents' failure to record the name of the leasing company employee they spoke to, thereby "call[ing] into question whether [the agents] ever really visited the leasing office at all to verify Ms. Soto-Medina's address." Doc. No. 76 at 25. Whether the agents received confirmation of Soto-Medina's residence was material to the issuance of the warrant, Morell-Oneill argues, because without confirmation that Soto-Medina lived in Apartment 201, there was insufficient evidence tying Morell-Oneill, and his alleged crimes, to the apartment. Id. 26–27. He speculates that the agents knew this and therefore invented the leasing company's verification of Soto-Medina's address to provide the missing link.

This argument misses the mark. Even ignoring the leasing office's verification of Soto-Medina's address, the search warrant affidavit contains sufficient evidence tying

Soto-Medina, and thus Morell-Oneill, to Apartment 201 in Building 140. Morell-Oneill was arrested driving a black Jeep registered to Soto-Medina, whose registration listed Apartment 201 as her address. Doc. No. 84-3 ¶ 13. Government agents frequently observed Morell-Oneill departing from Building 140 in the company of Soto-Medina. Id. ¶ 13 n.1. They also observed Morell-Oneill departing from Building 140 several times to make drug deals. Doc. No. 84-3 ¶¶ 13, 17, 20. The black Jeep registered to Soto-Medina was frequently parked in front of the building and court-authorized GPS tracking confirms it often remained there overnight. Id. ¶ 23. And on one occasion, government agents observed Soto-Medina and Morell-Oneill enter Building 140 at 4:26 a.m. and noted that the lights of Apartment 201 turned on shortly thereafter. Id. ¶ 24. This is enough—more than enough—to link Morell-Oneill to Apartment 201.

Nor is Morell-Oneill correct to suggest, relying on United States v. Roman, 942 F.3d 43 (1st Cir. 2019), that there were insufficient grounds for concluding that evidence of his alleged criminal enterprise would be found in Apartment 201. Doc. No. 76 at 12–17. True, "a suspect's status as a drug dealer standing alone does not give rise to a fair probability that drugs will be found in his home." United States v. Roman, 327 F. Supp. 3d 312, 326 (D. Mass. 2018), aff'd 942 F.3d 43 (1st Cir. 2019). But Roman is inapposite because here the warrant affidavit contains allegations "that directly connected the residence with drug activity." Roman, 942 F.3d at 49. Government agents observed Morell-Oneill leaving from Apartment 201 to make drug deals on two prior occasions. Doc. No. 84-3 ¶¶ 13, 17. Agents knew that Morell-Oneill had recently received a large shipment of drugs and would need somewhere to store it. Id. ¶ 19. And on the day of his arrest, Morell-Oneill was again observed leaving from the apartment on the way to his

drug deal, carrying a white shopping bag which agents found to contain drugs. Id. ¶ 20. This is sufficient to raise a "fair probability" that the drug inventory known to be in Morell-Oneill's possession could be found in Apartment 201.

Even when the affidavit is considered without the alleged falsehoods, it contains sufficient allegations to establish the essential nexus between Morell-Oneill's alleged criminality and Apartment 201. The Court therefore concludes that the alleged misrepresentations were not material because they were not "necessary to the finding of probable cause." Hicks, 575 F.3d at 138 (quoting Franks, 438 U.S. at 156).

Although this conclusion disposes of Morell-Oneill's arguments challenging the search warrant, the Court note's that there is a still more fundamental problem with Morell-Oneill's Franks argument—the absence of any evidence of misrepresentation. Morell-Oneill's argument rests on the alleged "irreconcilability" of the warrant affidavit and a later-filed investigation report. See Doc. No. 76 at 25. To him, the documents conflict because the warrant affidavit states the agents gained access to Apartment 201 using the leasing company's key while the report says they used Morell-Oneill's key to access the apartment. Id. at 19. From this slender reed, Morell-Oneill draws the inference that the agents entirely fabricated their conversation with the property manager, that they never confirmed Soto-Medina's residence in Apartment 201, and they instead walked around Building 140 trying Morell-Oneill's keys at random until a door opened. See id. at 19–25.

Of course, there is no evidence supporting Morell-Oneill's speculations. He has not submitted statements of the employees on duty in the leasing office that day or otherwise sought to substantiate his claims. And the supposedly "irreconcilable" statements Morell-Oneill points to are, in fact, perfectly consistent—he is simply wrong in claiming the warrant affidavit says the

agents used the management company's key to gain "access to the apartment." Id. at 18. The affidavit says that the "[a]gents used the [management company's] key to enter Building 140." Doc. 84-3 ¶ 25 (emphasis added). The affidavit makes no mention of entry to Apartment 201. There is therefore no conflict between the affidavit and the agents' report that they used Morell-Oneill's keys to access the apartment.[3]

Finally, Morell-Oneill's reliance on Bain is misplaced. In Bain, the First Circuit considered whether suppression was required when the only evidence in a warrant affidavit linking the defendant to the searched premises was derived from the fact the defendant's key fit the premises' door. United States v. Bain, 874 F.3d 1 (1st Cir. 2017). The Bain Court held that trying the defendant's key in the lock to determine whether they lived at that address was a search within the meaning of the Fourth Amendment, that this search had been unconstitutional, and therefore that a search warrant that rested on this unconstitutionally secured evidence was invalid. See Bain, 874 F.3d at 14–16. Here, the warrant affidavit does not rest upon whether Morell-Oneill's key fit in the door to Apartment 201—indeed, the affidavit does not mention the entry into Apartment 201 at all. See generally Doc. No. 84-3. It is therefore irrelevant for the purpose of assessing the sufficiency of the warrant affidavit whether the agents tried Morell-Oneill's key in the lock.

In conclusion, the affidavit warrant contained sufficient allegations to support the Magistrate Judge's determination that there was probable cause that evidence of Morell-Oneill's alleged crimes could be found in Apartment 201. Morell-Oneill has failed to make a "substantial preliminary showing" that the warrant affidavit contained misrepresentations and has also failed to show that the alleged misrepresentations were material. The Court therefore DENIES

---

[3] In addition, Morell-Oneill has no basis at all for the assertion that the agents did not speak to an employee of the leasing company.

suppression of the evidence seized in Apartment 201 under this search warrant and DENIES Morell-Oneill's motion for a Franks hearing.

IV.     CELLPHONE EVIDENCE

On the day of Morell-Oneill's arrest, agents seized seven cellphones from the vehicle he was driving. On February 20, 2019, law enforcement obtained a warrant to search the contents of these phones. Doc. No. 76 at 32. Morell-Oneill argues the evidence found on these phones should be suppressed because the search warrant affidavit fails to establish probable cause linking the cellphones to any criminal conduct. Id. But "[p]robable cause . . . is not a high bar: It requires only the 'kind of fair probability on which reasonable and prudent [people,] not legal technicians, act.'" Kaley v. United States, 571 U.S. 320, 338 (2014) (alteration in original) (quoting Florida v. Harris, 568 U.S. 237, 244 (2013)). The warrant affidavit establishes that Morell-Oneill had a suspiciously large number of cellphones in his possession at the time of his arrest, that he was arrested in possession of two kilograms of fentanyl, that he was travelling to a drug deal, and that a subsequent search of his residence uncovered approximately 32 kilograms of fentanyl. Doc. No. 74-3 ¶¶ 6, 10. The affidavit also contains statements by Morell-Oneill acknowledging that he is involved in drug trafficking activity. Id. ¶ 11. While in custody and at the direction of the agents, Morell-Oneill even transacted business related to drug trafficking and money laundering using one of the seized phones. Id. ¶¶ 14, 15. Taken together, this evidence raises the "fair probability" that evidence of Morell-Oneill's alleged crimes would be found on

the cellphones. The Court therefore DENIES Morell-Oneill's suppression motion as to the evidence secured from the search of these cellphones.

V.     GOOD FAITH

The Court has already concluded that the warrants authorizing the searches of both Apartment 201 and the seven cellphones found in Morell-Oneill's apparent possession were supported by probable cause. See supra. Even if they were not, the Court would deny Morell-Oneill's motion to suppress this evidence under the "good faith" exception of United States v. Leon, 468 U.S. 897 (1984). Although evidence obtained in violation of the Fourth Amendment must usually be suppressed, the "good faith" exception excuses evidence secured under the authority of a search warrant which is later found to be invalid, when law enforcement's reliance on that warrant was objectively reasonable. See Leon, 468 U.S. at 922. Here, the agents' reliance on the search warrants was objectively reasonable because the warrant affidavits contain detailed allegations suggesting a close nexus between Morell-Oneill's criminal activities and both Apartment 201 and the cellphones found in the vehicle he was driving. See supra.

Morell-Oneill argues the good faith exception is inapplicable when agents include material misrepresentations in their warrant affidavits. See Doc. No. 76 at 35 (citing Roman, 327 F. Supp. 3d at 312). This may or may not be true, but the Court has already concluded that there were no misrepresentations in the warrant affidavit. See supra. The good faith exception would therefore apply, even if the Court concluded the warrant affidavits were insufficient.

VI.    CONCLUSION

Morell-Oneill's motion to suppress is DENIED as to any statements given by Soto-Medina, the evidence found in Apartment 201, and the evidence found on the seven cellphones. His request for a Franks hearing is also DENIED. The Court reserves judgment on whether to

suppress Morell-Oneill's own statements pending an evidentiary hearing. That hearing will take place on October 7th, 2020 at 10:30 a.m.

                                    SO ORDERED.

                              /s/ Leo T. Sorokin
                              Leo T. Sorokin
                              United States District Judge